UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Case No.: 17-19455-MAM<br>Lead Case |
| CHARIOTS OF PALM BEACH, INC. | |
| | Jointly Administered with<br>17-19458-MAM |
| Debtor. | Chapter 7 |
| _____/ | |
| NICOLE TESTA MEHDIPOUR,<br>CHAPTER 7 TRUSTEE, | Adversary No. _____ |
| Plaintiff, | |
| v. | |
| LQD BUSINESS FINANCE LLC, | |
| Defendant. | |
| _____/ | |

## COMPLAINT

Nicole Testa Mehdipour, Chapter 7 Trustee (the "Plaintiff" or the "Trustee") of the Estates of Chariots of Palm Beach, Inc. and H&S, Inc. (collectively the "Debtors"), by and through undersigned counsel, hereby sues LQD Business Finance LLC ("Defendant"), and alleges:

## NATURE OF THE CASE

1.       Debtors were owned and controlled at all times material by a Hugh Bate ("Mr. Bate") who used Debtors' assets to operate a Ponzi scheme, enriching himself and his wife (Sarah Bate, hereafter "Mrs. Bate") (collectively with Mr. Bate, the "Insiders") at the expense of Debtors' creditors.  Despite the appearance of a financially profitable and solvent enterprise, the

Debtors in fact were insolvent for years before they filed for bankruptcy protection, and were able to keep up the appearance of solvency only by fraudulently inducing lenders to frequently extend credit.  By this action, the Trustee seeks recovery of all avoidable, preferential transfers to Defendant.

2.      More specifically, the Trustee seeks entry of a judgment against Defendant: (i) avoiding transfers pursuant to 11 U.S.C. § 547 and for unjust enrichment; (ii) directing the Defendant to pay an amount to be determined at trial no less than the amount of avoidable transfers, plus interest and costs, pursuant to 11 U.S.C. § 550(a); and (iii) disallowing any claims filed by Defendant against the Debtors unless and until Defendant returns the avoidable transfers to Plaintiff pursuant to 11 U.S.C. § 502(d).

## JURISDICTION AND VENUE

3.      This adversary proceeding arises out of the Chapter 7 bankruptcy cases of Chariots of Palm Beach, Inc. (17-19455-MAM) and H&S, Inc. (17-19458-MAM), which are pending in the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division, and being jointly administered (collectively the "Bankruptcy Case").

4.      This adversary proceeding is brought pursuant to Rule 7001, *et seq.* of the Federal Rules of Bankruptcy Procedure; Sections 502(d), 547(b), and 550(a) of the Bankruptcy Code; and Florida common law.

5.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334.

6.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

7.      This adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157(b).

2

8.      The Trustee consents to entry of a final order by the Court in this adversary proceeding.

## PARTIES AND PROCEDURAL HISTORY

9.      Prior to the Petition Date, Chariots of Palm Beach, Inc. ("Chariots") was a luxury used car dealership specializing in the purchase and sale of premium automobiles, and H&S, Inc. ("H&S") was a luxury rental car company.  Both Debtors operated out of 2400 N. Florida Mango Rd., West Palm Beach, Florida 33409, and used the same employees and the same website (www.chariotsofpb.com) in the operation of their businesses.

10.     At all times material to this Complaint, Mr. Bate was the sole shareholder and president of Chariots.  Mr. Bate also was the sole shareholder of H&S and served as its president, vice president, treasurer, and secretary.

11.     At all times material to this Complaint, Mrs. Bate was married to Mr. Bate. According to the website for Chariots and H&S, Mrs. Bate also served as the Director of Luxury Rental Division and "developed the rental division."

12.     On July 27, 2017 (the "Petition Date"), Chariots and H&S initiated the Bankruptcy Case by filing voluntary petitions for bankruptcy relief under Chapter 11 of the United States Bankruptcy Code.

13.     On September 19, 2017, the Court entered an Order Converting the Bankruptcy Case from cases pending under Chapter 11 to cases pending under Chapter 7 and appointed Nicole Testa Mehdipour as Trustee.

14.     Defendant is a corporation formed under the laws of the State of Illinois, with its principal place of business at 329 West 18th St. Suite 912, Chicago, Illinois 60616.  The Defendant has substantial and not isolated contacts with the State of Florida and the Southern District of Florida and otherwise transacts business in the State of Florida.

## FACTUAL ALLEGATIONS

### The Debtors' Fraudulent Scheme

15.     Debtors engaged various creditors to provide "floor plan financing" in the operation of their luxury automobile dealership and luxury car rental service.  Typically, under such an arrangement, a dealer obtains financing to acquire a vehicle it "floors" in its showroom, giving the creditor a security interest in the subject vehicle.  The floor plan creditor perfects its lien by taking possession of the vehicle's title.  When the vehicle is sold, the dealer forwards the proceeds of the sale, or a portion thereof, to the floor plan creditor to pay off the loan and release the title.

16.     Debtors, however, operated differently.  They created a fraudulent scheme involving multiple pledges of the same collateral or pledges of collateral in which they had no ownership interest (either because the "collateral" had been previously sold, or because it was sold on consignment).  This practice necessarily caused Debtors to incur obligations far exceeding the value of their assets and which they could not service without additional, fraudulently-obtained financing.  This operation resembled, for all material purposes, a Ponzi scheme.

17.     As an example, in May of 2017, Debtors "pledged" two vehicles, a 2006 Porsche 911 Carrera and a 2007 Bentley, to Flagler Bank ("Flagler"), in return for funding of almost $90,000; however, Debtors had sold these vehicles almost ten years earlier, in 2008.

18.     In other instances, Debtors simply pledged a single piece of collateral to multiple creditors, with each creditor allegedly believing it had a perfected, senior lien.  This cross-collateralization kept the money rolling in from floor plan creditors, allowing Debtors to pay down existing debt as it came due without even selling the vehicle securing that debt.

19.     Another scheme employed by the Debtors involved simply selling collateral without the knowledge of the creditors holding security interests in them.  For example, as shown by the July 25, 2017 audit conducted by Next Gear Capital, Inc. ("NextGear"), out of 75 vehicles in which NextGear asserted a security interest, 19 had been sold without NextGear's knowledge and without the Debtors forwarding the proceeds of those sales to NextGear.  Debtors thus realized proceeds from the sale of collateral, but did not reduce their corresponding debts.

20.     In furtherance of their scheme, on information and belief, Debtors obtained fraudulent, duplicate titles to the vehicles they held (or did not hold) in their inventory.

21.     Debtors' counsel "realized that the Debtors' former principal had defrauded creditors and other third persons and entities" for a period of years before the Petition Date and described it as "allow[ing] the former principal to move inventory from one secured lender to another."  In addition, one creditor characterized the scheme as a "systematic fraud intended to misrepresent the status of [parties'] collateral" which led to "millions of dollars in collateral [going] unaccounted for."

22.     The Debtors' scheme went on continuously for years prior to the Petition Date.  One 2013 Porsche Panamera 4 purchased by Debtors on March 10, 2014, was pledged to a creditor on April 7, 2014, and sold on June 21, 2014, before being pledged to Flagler on April 4, 2017.  Another vehicle, a 2016 Mercedes E350 purchased by Debtors on January 16, 2017, was sold on April 19, 2017, before being pledged to NextGear the following day, on April 20, 2017, then to Anchor Commercial Bank on May 3, 2017, and finally to Flagler on May 17, 2017.  Conduct such as this allowed Debtors to rapidly and fraudulently inflate their revenue, while simultaneously siphoning money to the Insiders and their creditors.

23.     Consumer complaints further demonstrate that Debtors' scheme operated for at least four years before the Petition Date.  One individual placed his 2012 Bentley on

consignment with Chariots in June 2013, and Chariots attempted to sell the vehicle below the price approved by the consignor and without distributing the proceeds to the consignor. Chariots only returned that vehicle, which sustained substantial damage Chariots hid from the consignor while the vehicle was in its care, after months of demands and threatened litigation from the consignor.

24.       As of June 30, 2017, less than a month before the Petition Date, Debtors had over $2.3 million in floor plan loans outstanding with Flagler, purportedly secured by almost forty vehicles. However, an analysis of Flagler's collateral on that date showed that only two of those vehicles – securing only $150,000 of the total $2.3 million – were in Debtors' possession. Even the two accounted-for vehicles were cross-collateralized with another floor plan lender, and one of the vehicles actually was on consignment from a third party.

25.       Simply put, Debtors operated with the appearance of a financially successful and secure enterprise, when in fact the company was perpetually insolvent, propped up only as long as they could keep the Ponzi scheme going.

### The Creditors' and Third Parties' Willful Blindness

26.       Debtors were able to keep this scheme afloat for years thanks to inadequate oversight by – and perhaps even the cooperation of – its floor plan creditors and third parties.

27.       Ron Mackail and Edward Sterling, principals of Debtors' outside accountant (Mackail and Sterling, CPA's and Associates, PA) ("Mackail & Sterling"), also serve as directors of Flagler, one of Debtors' floor plan creditors with which they kept their operating account.

28.       Mackail & Sterling also prepared Debtors' balance sheets, including one balance sheet prepared for Chariots less than one month before the Petition Date that failed to reveal any financial difficulties and even reflected hundreds of thousands of dollars in stockholder equity.

29.    The June 30, 2017, balance sheet prepared by Mackail & Sterling – the same balance sheet purportedly showing a financially healthy car dealership – was prepared on the very same day as the analysis showing that virtually all of Flagler's collateral was missing.

30.    When asked by Debtors' counsel how Flagler did not know it was "out of trust," *i.e.*, that its collateral had been sold and proceeds dissipated, Mr. Bate responded that "Flagler's inspections weren't as stringent or as frequent" as those of other creditors.

31.    Additionally, Debtors failed to keep proper accounting records, further obscuring the fraud.

32.    Debtors' counsel called the lack of oversight "unbelievable," expressing his disbelief – with respect to the post-sale pledging scheme in particular – that the floor plan creditors "would not first see that there was no such car and incredible that they would not think something was wrong with a car showing up on a floor plan for several years – depreciating on them all the while."

### The Debtors' Insolvency

33.    Debtors were able to hold themselves out as solvent on a balance-sheet and cash-flow basis only because of the fraudulent scheme they carried out.  Bankruptcy revealed the true extent of the Debtors' insolvency, as Debtors' counsel discovered that "there [was] no way to show net profit over operational expenses even after cutting the budget way back."

34.    Indeed, Debtors were in a precarious financial position, a house of cards that would have collapsed if any of Debtors' floor plan creditors conducted their due diligence and discovered that their collateral was being sold out from under them, was being pledged to other parties, or simply did not exist.  As a result, Debtors' balance sheets cannot be credited to the extent they characterize Debtors as solvent enterprises; an honest accounting of Debtors' books would show that they were insolvent for many years prior to the Petition Date.

35.    Debtors' fraudulent scheme rendered Debtors insolvent because:

    a.    By taking out multiple loans on a given vehicle in a total amount exceeding the value of that vehicle, Debtors necessarily engaged in transactions or business for which Debtors' assets were insufficient; each of Debtors' vehicles in their inventory secured financing exceeding the amount Debtors could hope to realize from selling or renting that vehicle.

    b.    By taking out multiple loans on a given vehicle in a total amount exceeding the value of that vehicle, Debtors intended to incur, believed they would incur, or reasonably should have believed they would incur debts beyond their ability to pay as they became due.  Indeed, Debtors were only able to pay down certain obligations in many instances by fraudulently securing subsequent financing, in many instances doing so by pledging vehicles that they did not even possess or own.

36.    By carrying out the fraudulent schemes described above in conjunction with the cooperation or willful blindness of precisely those entities that should have been holding Debtors accountable, Debtors were able to mask, through false or misrepresented balance sheets and other financials, that their liabilities greatly exceeded the value of their assets.  This insolvency was further exacerbated by the net outflow of cash from Debtors, itself hidden by Debtors' falsified financials.

37.    Specifically, according to the schedules filed by Debtors, the total liabilities of the Chariots estate exceed its total assets by over $7 million, more than 70 percent of the value of the assets of the Chariots estate.  Similarly, the Schedules of H&S reflect claims exceeding the value of the H&S estate's assets by $1.75 million – approximately 300 percent of that estate's value.

38.    The June 30, 2017, balance sheet prepared for Chariots illustrates how far off Debtors' assessment of their financial status was; despite being prepared less than a month before the Petition Date, at which time the total liabilities of the Chariots estate exceeded its total assets by over $7 million, the June 30, 2017, balance sheet reflects stockholders' equity of $222,284.41.

39.    The balance sheets purportedly showing the Debtors as profitable and solvent were prepared by Mackail & Sterling, whose principals also serve as directors of Flagler, a floor plan creditor of Debtors and where Debtors kept their operating account.  Thus, it would appear that even Debtors' "independent" auditors had a conflict and were willing to turn a blind eye to Debtors' misconduct.

40.    As detailed herein, Debtors carried on their fraudulent scheme throughout the four years preceding the Petition Date, placing them in a precarious financial position that requires the Court to look beyond Debtors' own balance sheets and representations regarding their solvency.  Such an analysis demonstrates that Debtors vastly overstated the value of their assets and actually were insolvent on or before July 28, 2016, and throughout the one-year period preceding the Petition Date.

**The Recoverable Transfers**

41.    From July 28, 2016, through July 27, 2017, Chariots paid and/or transferred to the Defendant the total sum of $252,043.10 (the "Recoverable Transfers").  The Recoverable Transfers are documented in Exhibit "1."

42.    From April 29, 2017, through July 27, 2017, Chariots paid and/or transferred to the Defendant the total sum of $75,612.93 (the "Preferential Transfers").  The Preferential Transfers are documented in Exhibit "2."

43.    Chariots was not reimbursed for the Recoverable Transfers.

**The Badges of Fraud**

44.    The circumstances surrounding the Recoverable Transfers clearly show the existence of several "badges of fraud" – and thus, actual fraud – as defined by section 726.105(2) of the Florida Statutes:

a. <u>The beneficiaries of the Recoverable Transfers were Insiders.</u>  Mr. Bate was an officer of Debtors, Mrs. Bate was his spouse (section 726.102 of the Florida Statutes defines "insiders" to include officers and their relatives), and the Recoverable Transfers were made entirely for the Insiders' benefit;

b. <u>Debtors removed or concealed assets.</u>  As described more fully in ¶ 16, *supra*, Debtors "pledged" vehicles in order to obtain financing even after those vehicles had been sold;

c. <u>Each of the Recoverable Transfers was made for less than reasonably equivalent value.</u>  Chariots made the Recoverable Transfers without receiving any value from the Defendant-recipient; and

d. <u>The Debtors were insolvent at the time of the Recoverable Transfers.</u>  As more fully set forth *supra*, Debtors were able to service existing debt and pay operational expenses only so long as they carried on the fraudulent scheme described above.  If Debtors had made truthful disclosures to their creditors and accountants, Debtors' income statements and balance sheets would have reflected negative net income and debts exceeding assets.

45.    This same evidence demonstrates that the Recoverable Transfers were constructively fraudulent.

46.    During the pendency of this adversary proceeding, Plaintiff may learn (through discovery or otherwise) of additional transfers made to the Defendant during the period from July 28, 2016, through July 27, 2017.  Plaintiff reserves the right to amend this Complaint to include: (i) further information regarding the transfers; (ii) additional transfers; (iii) modifications of and/or revisions to the amount of transfers; and (iv) additional defendants, that may become known, and to request that any such amendments relate back to this original Complaint.

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
*(Avoidance of Preferential Transfers Pursuant to 11 U.S.C. § 547(b))*

47.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 46 of this Complaint as though set forth herein.

48.     Chariots made the Preferential Transfers to the Defendant from April 29, 2017, through July 27, 2017.

49.     The Preferential Transfers were transfers of an interest in the property of Chariots.

50.     The Preferential Transfers were made to or for the benefit of the Defendant.

51.     At the time of the Preferential Transfers, the Defendant was a creditor of Chariots.

52.     The Preferential Transfers were made on account of one or more antecedent debts owed to the Defendant by Chariots.

53.     Each of the Preferential Transfers was to or for the benefit of a creditor within the meaning of 11 U.S.C. § 547(b)(1) because each such transfer was on account of a debt or debts owed by Chariots to the Defendant.

54.     At the time of the Preferential Transfers, Chariots was insolvent or became insolvent as a result of the Preferential Transfers because its liabilities far exceeded its assets, as reflected in the Amended Schedules filed in the Bankruptcy Case.

55.     The Preferential Transfers enabled the Defendant to receive more than the Defendant would receive if (a) the Preferential Transfers had not been made, and (b) the Defendant received payment of such debt under Chapter 7 of the Bankruptcy Code.

56.     The Defendant was the initial transferee of the Preferential Transfers and the person for whose benefit the Preferential Transfers were made.

57.     The Preferential Transfers are avoidable pursuant to § 547(b) of the Bankruptcy Code.

**WHEREFORE**, the Trustee demands judgment against Defendant (a) determining that each of the Preferential Transfers is avoidable as a preferential transfer under § 547(b) of the Bankruptcy Code; (b) avoiding each of the Preferential Transfers and entering judgment in favor of Plaintiff and against the Defendant in such amounts as are determined at trial, or the value

thereof, and as otherwise detailed in the amounts set forth herein, plus pre-judgment interest from the date of the transfers and post-judgment interest, and costs of suit, all pursuant to 11 U.S.C. § 550; (c) disallowing any claim that the Defendant may have against Debtors or their estates, including without limitation, pursuant to and as provided in 11 U.S.C. § 502(d); and (d) for such other and further relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION
### *(Unjust Enrichment)*

58.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 46 of this Complaint as though set forth herein.

59.     Chariots conferred a benefit on Defendant when it made the Recoverable Transfers to Defendant.

60.     Defendant was aware of the benefit conferred on it by Chariots.

61.     Defendant voluntarily accepted and retained the Recoverable Transfers.

62.     It would be inequitable for Defendant to retain the Recoverable Transfers without paying the value thereof to Plaintiff.

**WHEREFORE**, the Trustee demands judgment against the Defendant (a) determining that each of the Recoverable Transfers unjustly enriched the Defendant under Florida law; (b) avoiding each of the Recoverable Transfers and entering judgment in favor of Plaintiff and against the Defendant in such amounts as are determined at trial, or the value thereof, and as otherwise detailed in the amounts set forth herein, plus pre-judgment interest from the date of the transfers and post-judgment interest, and costs of suit, all pursuant to 11 U.S.C. § 550; (c) disallowing any claim that the Defendant may have against Debtors or their estates, including without limitation, pursuant to and as provided in 11 U.S.C. § 502(d); and (d) for such other and further relief as the Court deems just and proper.

### THIRD CAUSE OF ACTION
#### *(Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550(a))*

63.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 46 of this Complaint as though set forth herein.

64.     Defendant was the initial transferee of the Recoverable Transfers and the entity for whose benefit the Recoverable Transfers were made.

65.     The value of the Recoverable Transfers, to the extent they are avoided pursuant to §§ 544 and 547(b) of the Bankruptcy Code, may be recovered by Plaintiff pursuant to § 550(a) of the Bankruptcy Code.

**WHEREFORE**, the Trustee demands judgment against the Defendant (a) determining that each of the Recoverable Transfers is fraudulent and avoidable under §§ 544 and 547(b) of the Bankruptcy Code; (b) avoiding the Recoverable Transfers and entering judgment in favor of Plaintiff against the Defendant in such amounts as are determined at trial, and as otherwise detailed in the amounts set forth herein, plus pre-judgment interest from the date of the transfers and post-judgment interest, and costs of suit, all pursuant to 11 U.S.C. § 550; (c) disallowing any claim that the Defendant may have against Debtors or their estates, including without limitation, pursuant to and as provided in 11 U.S.C. § 502(d); and (d) for such other and further relief as the Court deems just and proper.

### FOURTH CAUSE OF ACTION
#### *(Disallowance of Claims Against the Estates Pursuant to 11 U.S.C. § 502(d))*

66.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 46 of this Complaint as though set forth herein.

67.     Defendant is the recipient of the Recoverable Transfers, which are recoverable and avoidable pursuant to §§ 544, 547, and 550 of the Bankruptcy Code, and Defendant has not returned the Recoverable Transfers to Plaintiff and/or Chariots.

68.     Because Defendant has not paid or returned the Recoverable Transfers to Plaintiff and/or Chariots, any and all claims of Defendant must be disallowed under § 502(d) unless and until the amount of the Recoverable Transfers is returned to Chariots and/or the Plaintiff.

**WHEREFORE**, the Trustee demands judgment against the Defendant (a) disallowing any claim filed by Defendant against the Debtors or their estates; (b) awarding the Plaintiff pre-judgment interest from the date of the transfers and post-judgment interest, and costs of suit, all pursuant to 11 U.S.C. § 550; and (c) for such other and further relief as the Court deems just and proper.

### FIFTH CAUSE OF ACTION
*(Equitable Subordination of Claims Under 11 U.S.C. § 510(b))*

69.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 46 of this Complaint as though set forth herein.

70.     Defendant engaged in inequitable conduct by accepting the Recoverable Transfers while Chariots was insolvent.

71.     Defendant's conduct injured other creditors by depleting the assets of the Chariots Estate, thereby decreasing the assets available to pay the claims of the Chariots Estate's creditors.

72.     Subordination of Defendant's claim would be consistent with the Bankruptcy Code.

**WHEREFORE**, the Trustee demands judgment against the Defendant (a) subordinating Defendant's claims against the Debtors or their estates; and (b) for such other and further relief as the Court deems just and proper.

Dated this 26th day of July, 2019.        Respectfully submitted,

**WARGO & FRENCH, LLP**
201 S. Biscayne Boulevard
Suite 1000
Miami, FL 33131
Telephone:     (305) 777-6000
Facsimile:      (305) 777-6001

By: */s/ Michael C. Foster*
        Michael C. Foster, Esq.
        Florida Bar No. 0042765
        mfoster@wargofrench.com
        Kristopher E. Aungst, Esq.
        Florida Bar No. 0055348
        kaungst@wargofrench.com
        James P. McCaughan, Esq.
        Florida Bar No. 0109938
        jmccaughan@wargofrench.com